IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HAWAIIAN HOST, INC., | Civ. No. 22-00077 JMS-RT |
| Petitioner, | ORDER GRANTING PETITIONER'S MOTION TO CONFIRM, ECF NO. 1-3, AND DENYING RESPONDENTS' COUNTER-MOTION TO VACATE, ECF NO. 16, ARBITRATION AWARD |
| vs. | |
| CITADEL PACIFIC LTD.; CITADEL FOOD GROUP HAWAII LLC; CITADEL WINDBREAK LLC, | |
| Respondents. | |

## ORDER GRANTING PETITIONER'S MOTION TO CONFIRM, ECF NO. 1-3, AND DENYING RESPONDENTS' COUNTER-MOTION TO VACATE, ECF NO. 16, ARBITRATION AWARD

## I.  INTRODUCTION

Petitioner Hawaiian Host, Inc. ("Hawaiian Host" or "Petitioner")[1]

moves under the Federal Arbitration Act ("FAA") to confirm a March 29, 2022,

Amended Final Arbitration Award (the "Arbitration Award") decided by Arbitrator

Kale Feldman (the "Arbitrator") and administered through Dispute Prevention &

Resolution, Inc. ("DPR"), in Honolulu, Hawaii, under the commercial rules of the

---

[1] Petitioner Hawaiian Host, Inc. was a Hawaii corporation with its principal place of business in Hawaii when it filed the underlying arbitration.  *See* ECF No. 12-1.  According to the Articles of Merger filed on December 30, 2021, as of December 31, 2021, Hawaiian Host, Inc. merged with a new entity, Hawaiian Host LLC.  *See* ECF No. 52 at 2, PageID.3446.  Citadel makes much of this merger, *see, e.g.*, ECF Nos. 32, 62, but—as discussed later in this Order— the court ultimately concludes that the merger has no effect on the Motion to Confirm or Counter-Motion to Vacate.

American Arbitration Association ("AAA").[2]  *See* ECF No. 1-3; ECF No. 12-1.

Hawaiian Host originally filed its Motion to Confirm Arbitration Award and for

Entry of Judgment ("Motion to Confirm") in the Circuit Court of the First Circuit

of the State of Hawaii ("State Court"), but Respondents Citadel Pacific Ltd.,

Citadel Food Group Hawaii LLC, and Citadel Windbreak LLC (collectively,

"Citadel" or "Respondents") removed the action to this U.S. District Court for the

District of Hawaii.  *See* ECF No. 1.  After removal, Citadel filed its Opposition and

Counter-Motion to Vacate the Arbitration Award ("Counter-Motion to Vacate").

ECF No. 16.

        By and large, much of what Citadel asks the court to do in its

Opposition and Counter-Motion to Vacate amounts to an analysis that an appellate

court might take in evaluating an appeal after a civil trial.  But such a review of an

arbitration award is entirely improper under the FAA.  As explained to follow, this

proceeding is meant to be a narrow and limited review of a private arbitration

award.  Anything further violates the FAA's statutory regime and the Supreme

Court's repeated guidance that courts are not to "take full-bore legal and

evidentiary appeals" in reviewing arbitration awards under the FAA.  *Oxford*

---

[2] In seeking to confirm, Petitioner invoked 9 U.S.C. § 9; Hawaii Revised Statutes ("HRS") §§ 658A-22 and -25; and Rule 52(c) of the AAA's Commercial Arbitration Rules.  *See* ECF No. 1-3 at 3, PageID.14.

*Health Plans LLC v. Sutter*, 569 U.S. 564, 568–69 (2013) (citation and internal quotation marks omitted).

Applying the FAA's standards—recognizing that the underlying arbitration was long and complex—the court has reviewed the voluminous record consisting of hundreds of exhibits and thousands of pages. It has considered the extensive original and supplemental briefing, and the oral arguments of the parties. Based on the following, the court GRANTS Hawaiian Host's Motion to Confirm, ECF No. 1-3, and DENIES Citadel's Counter-Motion to Vacate, ECF No. 16.

## II. <u>STANDARDS OF REVIEW</u>

Before setting forth the essential background, the court first explains the lens through which it reviews the Arbitration Award. The court begins with the standards of review because, upon analyzing the nature of the Arbitration Award and the questions of law it presents, the applicable legal standards are somewhat different than what the parties have assumed (although the standards ultimately lead to the same results).

The FAA consists of three chapters. Chapter 1, 9 U.S.C. §§ 1–16, covers domestic arbitrations; Chapter 2, 9 U.S.C. §§ 201–208, covers non-domestic arbitrations under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958; and Chapter 3, 9 U.S.C. §§ 301–307,

covers arbitrations under the Inter-American Convention on International Commercial Arbitration of January 30, 1975. *See, e.g.*, *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007). The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38—which Congress implemented in Chapter 2 of the FAA—is often referred to (and the court does so here) as the "New York Convention," as it was facilitated by the United Nations and adopted in New York. *See, e.g.*, *Ministry of Def. of Islamic Republic of Iran v. Gould Inc.*, 887 F.2d 1357, 1362 (9th Cir. 1989).

## A.    Chapter 2 of the FAA Applies

The parties have briefed the Motions assuming that the Motions are governed by the standards in Chapter 1 of the FAA, specifically 9 U.S.C. §§ 9–11. *See, e.g.*, ECF No. 1-3 at 3, PageID.14 (Petitioner invoking, among other grounds, 9 U.S.C. § 9); ECF No. 16-1 at 14–15, PageID.119–20 (Respondents applying 9 U.S.C. §§ 10(a) and 11); and ECF No. 27 at 18–19, PageID.1897–898 (Petitioner citing *Kyocera Corp. v. Prudential-Bache Servs, Inc.*, 341 F.3d 987, 994 (9th Cir. 2003), which applied 9 U.S.C. §§ 1–16, as "enumerat[ing] limited grounds on which a federal court may vacate, modify, or correct an arbitral award").

At first glance, relying on those standards here makes sense because, as to confirmation, Chapter 1 of the FAA treats confirming and vacating as opposite sides of the same coin.  Specifically, 9 U.S.C. § 9 provides in part that, upon application, "the court must grant such an order [confirming the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  And, in turn, 9 U.S.C. § 10(a) provides the following standards for vacating an award:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Likewise, 9 U.S.C. § 11 sets forth the limited situations in which a court may modify or correct an arbitration award.

But here, Citadel removed the action from State Court, basing federal jurisdiction on 9 U.S.C. § 203—the New York Convention—as well as on diversity of citizenship under 28 U.S.C. § 1332.[3]  *See* ECF No. 1 at 3, PageID.3. Citadel's Notice of Removal established that the three Respondents (Citadel Pacific Ltd., Citadel Food Group Hawaii LLC, and Citadel Windbreak LLC) all have citizenship in the Cayman Islands, and that at least the primary Respondent, Citadel Pacific Ltd., has a principal place of business in Manila, Philippines.  *See* ECF No. 1 at 4, PageID.4.  Citadel therefore asserted that the Arbitration Award falls under the New York Convention because Citadel has foreign citizenship and because the Arbitration Award is based on a "commercial relationship."  *See id.* at 3–4, PageID.3–4 (citing 9 U.S.C. § 202) (other citations omitted).

---

[3] Section 203 vests subject matter jurisdiction in federal district courts, providing as follows:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

9 U.S.C. § 203.

Upon review of the Notice of Removal and the Arbitration Award, the court agrees that the Arbitration Award is non-domestic and thus falls under the New York Convention.  *See, e.g.*, *Gould*, 887 F.2d at 1362 (explaining that to fall under the New York Convention "the [arbitration] award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope"); *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015 (5th Cir. 2015) ("An award's enforcement is governed by the [New York] Convention, as implemented at 9 U.S.C. § 201 et seq., if the award arises out of a commercial dispute and at least one party is not a United States citizen."); *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998) (holding that "an arbitral award made in the United States, under American law, falls within the purview of the New York Convention—and is thus governed by Chapter 2 of the FAA—when one of the parties to the arbitration is domiciled or has its principal place of business outside of the United States").[4]

---

[4] An arbitration award also falls under the New York Convention when "made in a country other than that in which enforcement of the award is sought." *Indus. Risk*, 141 F.3d at 1440.  That is, the New York Convention encompasses two types of arbitral awards: (i) awards made abroad and (ii) non-domestic awards. *See, e.g.*, *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 18 (2d Cir. 1997).  The Arbitration Award at issue in this case, issued in Honolulu, falls under the New York Convention as a "non-domestic" award because of Citadel's foreign citizenship.

Moreover, Chapter 2 of the FAA applies notwithstanding the existence of diversity of citizenship.  *See Indus. Risk*, 141 F.3d at 1439–40 ("The district court proceeded in the belief that its jurisdiction was grounded in diversity, and that its treatment of the arbitral proceedings was therefore controlled by Chapter 1 of the [FAA], which covers domestic arbitral proceedings.  We conclude that the district court was in error, and hold that the case is controlled by Chapter 2 of the FAA, 9 U.S.C. §§ 201–208, which covers international arbitral proceedings.").

## B.   9 U.S.C. § 207 and Article V of the New York Convention

Accordingly, because the court applies Chapter 2 of the FAA, the court addresses confirmation by applying 9 U.S.C. § 207—not 9 U.S.C. § 9.[5]  In this regard, § 207 provides:

---

[5] For the same reason, removal from State Court to federal court is covered by 9 U.S.C. § 205, which provides in pertinent part:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal.

> Within three years after an arbitral award falling under the [New York] Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. *The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.*

9 U.S.C. § 207 (emphasis added).  In turn, Article V of the New York Convention specifies the "grounds for refusal or deferral of recognition or enforcement of the award" in § 207.  *See, e.g.*, *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096 (9th Cir. 2011).  Article V provides:

> (1) Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

> > (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

> > (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

9

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

(2) Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, Art. V.

"These seven grounds are the only grounds [for refusing to confirm] explicitly provided under the [New York] Convention." *Yusuf Ahmed Alghanim & Sons, W.L.L.*, 126 F.3d at 19; *see also LaPine v. Kyocera Corp.*, 2008 WL 2168914, at *5 (N.D. Cal. May 23, 2008) ("Together, the five grounds in Article V(1) and the two grounds in Article V(2) are the only grounds for refusal [to confirm] explicitly provided under the [New York] Convention."). Indeed, the New York Convention provides no specific standards for *vacating* an award—as its full title indicates, it concerns "recognition and enforcement" of foreign arbitral awards. But the analysis does not end there.

## C.     The Court Also Applies 9 U.S.C. § 10(a)'s Vacatur Standards

"Although Article V provides the exclusive grounds for refusing confirmation under the [New York] Convention, one of those exclusive grounds is where '[t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.'" *Yusuf Ahmed Alghanim & Sons, W.L.L.*, 126 F.3d at 20 (quoting New York Convention, art. V(1)(e)). And this court agrees with cases interpreting Article V(1)(e) to mean that if a federal district court is reviewing a non-domestic arbitration award decided in the United States and not abroad—such as the Arbitration Award between Hawaiian Host and Citadel—then the court is also authorized to consider

11

"domestic arbitral law" to decide whether to *vacate* the arbitration award.[6]  *See id.* at 21 ("We read Article V(1)(e) of the [New York] Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award."); *see also, e.g.*, *Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 709 (6th Cir. 2005) ("Because this award was made in the United States, we can apply domestic law, found in the FAA, to vacate the award."), *abrogated on other grounds by Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008).[7]

---

[6] The result would be different for reviewing an arbitration award that falls under the New York Convention by virtue of being issued *outside* the United States.  If, for example, an arbitration award was issued in London, England, this court would have no power to annul or vacate that award (that is, to "set aside" or "suspend" it under article V(1)(e)).  Only an English tribunal would have power to annul or vacate the award.  *See, e.g.*, *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003) ("[E]ven though courts of a *primary* jurisdiction may apply their own domestic law when evaluating an attempt to annul or set aside an arbitral award, courts in countries of *secondary* jurisdiction may refuse enforcement only on the limited grounds specified in Article V."); *Yusuf Ahmed Alghanim & Sons, W.L.L.*, 126 F.3d at 21 (agreeing that "only the [country] under whose procedural law the arbitration was conducted has jurisdiction under Article V(1)(e) to vacate the award, whereas on a petition for confirmation made in any other [country], only the defenses to confirmation listed in Article V of the Convention are available" (citation omitted)).

In this regard, the New York Convention distinguishes between "recognition and enforcement" of an award, and affirmatively "setting aside or suspending" (i.e., vacating or annulling) an award.  *See, e.g.*, *Zeiler v. Deitsch*, 500 F.3d 157, 165 n.6 (2d Cir. 2007).

[7] Whether Article V(1)(e) permits courts to apply domestic arbitral law appears to be "an open question in the Ninth Circuit."  *LaPine*, 2008 WL 2168914, at 5.  Nevertheless, many other Circuits have found that standards in Chapter 1 of the FAA for vacating awards can apply when a court is reviewing a non-domestic award under the New York Convention that was made in the United States under American law, and the Supreme Court has implicitly adopted that position.  *See, e.g.*, *Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 34 F.4th 1290, 1299-1301

(continued . . .)

This reading is consistent with Chapter 2's "residual application clause," which provides that "Chapter 1 [of the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States." 9 U.S.C. § 208.

In effect, then, in deciding the Motion to Confirm and the corresponding Cross-Motion to Vacate, this court applies the seven factors in Article V to address confirmation, and in so doing may *also* consider the additional factors listed in 9 U.S.C. § 10(a) for vacatur.

Under this regime, an "emphatic federal policy" favors arbitral dispute resolution. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). "[T]hat federal policy applies with special force in the field of international commerce." *Id.* "A district court's review of an award is 'extraordinarily narrow.'" *Asignacion*, 783 F.3d at 1015. "[A] court reviewing an award under the [New York] Convention cannot refuse to enforce the award

---

(. . . continued)
(11th Cir. 2022) (Eleventh Circuit panel recognizing that "[m]any of our sister circuits are in alignment," and analyzing *BG Group, PLC v. Republic of Argentine*, 572 U.S. 25 (2014) as support) (citing cases), *rehearing en banc granted*, 50 F. 4th 97 (11th Cir. Oct. 5, 2022) (mem.). Only the Eleventh Circuit in *Industrial Risk Insurers*, 141 F.3d at 1445–46, has precluded the FAA's standards for vacatur from applying in reviewing any award falling under the New York Convention. But *Corporacion AIC, SA*—in comprehensively reviewing the issues—has called for the Eleventh Circuit to overrule en banc that aspect of *Industrial Risk Insurers*, *see* 34 F.4th at 1301, and in fact the Eleventh Circuit has granted rehearing en banc in *Corporacion AIC, SA*. *See* 50 F.4th at 97.

solely on the ground that the arbitrator may have made a mistake of law or fact."
*Id.* Courts "construe the Article V defenses to enforcement narrowly to encourage the recognition and enforcement of commercial arbitration agreement in international contracts." *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 497 (5th Cir. 2020) (citation and internal editorial marks omitted); *see also Cubic Def. Sys., Inc.*, 665 F.3d at 1096 (reiterating that Article V "defenses are construed narrowly"). And "[t]he party opposing enforcement of the award on one of the grounds specified in the [New York] Convention has the burden of proof." *Asignacion*, 783 F.3d at 1015–16.

Likewise, "[u]nder the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health Plans LLC*, 569 U.S. at 568 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). Under 9 U.S.C. § 10(a)(4), arbitrators exceed their powers "when the award is 'completely irrational' or exhibits a 'manifest disregard of the law." *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (quoting *Kyocera Corp.*, 341 F.3d at 997).

> An award is completely irrational only where the arbitration decision fails to draw its essence from the agreement. An arbitration award draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties'

14

> intentions.  Under this standard of review, [courts] decide
> only whether the [arbitrator's] decision draws its essence
> from the contract, not the rightness or wrongness of the
> arbitrator's contract interpretation.

*Id.* (internal citations and quotation marks omitted).  "It must be clear from the record that the arbitrator[] recognized the applicable law and then ignored it." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007).  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

In sum, under the FAA, courts perform only an "extremely limited review . . . a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures."  *Kyocera Corp.*, 341 F.3d at 998.  "If parties could take full-bore legal and evidentiary appeals, arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process."  *Oxford Health Plans LLC*, 569 U.S. at 568–69 (citation and internal marks omitted).

### III.  **BACKGROUND**

With the applicable standards in mind, the court explains the basic factual and procedural background leading to the Arbitration Award.  The dispute

15

between the parties, however, encompasses much more than what was arbitrated, and the court need not reiterate all the details of the underlying dispute. Rather—given the "extremely limited review," *Kyocera Corp.*, 341 F.3d at 998, that federal courts undertake of arbitration awards under the FAA—the court sets forth only the basic "big picture" background as necessary to put this decision in context. Other relevant factual or procedural details are discussed later, when analyzing the various factors in determining whether to confirm or vacate the Arbitration Award.

## A.    Hawaiian Host

Hawaiian Host and a subsidiary, Mauna Loa Macadamia Nut Corporation ("Mauna Loa"), manufacture and sell food and nut products. "Hawaiian Host and Mauna Loa are two of Hawaii's premier brands," with "the roots of the company [going back] to 1927." ECF No. 43 at 2, PageID.2894. Headquartered in Honolulu, Hawaiian Host has offices or facilities in Hawaii, California, Japan, and Singapore. *Id.* at 4, PageID.2896. After Hawaiian Host acquired Mauna Loa in 2015, and for other financial reasons, a decision was made in about 2018 "to transform the capital structure and balance sheet of the company." *Id.* at 8, PageID.2900. Its financial "debt position" was high, with some $65 million in "debt facilities" held by First Hawaiian Bank ("First Hawaiian" or "FHB") and Central Pacific Bank ("CPB"), where First Hawaiian

was the "administrative agent." *Id.* at 8–10, PageID.2900–02.  As part of the

restructuring effort, Hawaiian Host and First Hawaiian held negotiations and made

transactions in 2018 and 2019 to restructure or refinance the $65 million in loans.

*Id.*  Hawaiian Host and First Hawaiian entered into a "Credit Agreement"

regarding these loans in 2019.  *Id.* at 10, PageID.2902; ECF No. 16-3.  The loans

were apparently reduced to about half of the $65 million.  *See* ECF No. 27 at 9,

PageID.1888.

Then came the pandemic.  For a company heavily dependent on

tourism, the effect was "devastating."  ECF No. 43 at 17, PageID.2909.  "[T]he

company went from selling somewhere in the 11 and 12 million dollars a month in

sales to about April of 2020 it was selling just over $3,000,000."  *Id.*  As Hawaiian

Host describes it, the pandemic "transformed what had been a long-term

restructuring project into an urgent need for new investment."  ECF No. 27 at 10,

PageID.1889.

## B.     The Confidentiality Agreement

In July 2020, Hawaiian Host entered discussions with Citadel

regarding major investments in Hawaiian Host.  Hawaiian Host describes Citadel

as a "long time [First Hawaiian] client . . . whose business model is premised on

acquiring other companies."  *Id.*  The court need not describe many of the details

of these negotiations, but they involved among other things, the First Hawaiian

loans (or Credit Agreement, discussed earlier).  An important point for present

purposes is that Hawaiian Host and Citadel entered into a July 13, 2020

Confidentiality Agreement (the "Confidentiality Agreement"), ECF No. 16-9, to

facilitate negotiations.  The Confidentiality Agreement was necessary, especially

from Hawaiian Host's perspective, because Hawaiian Host was opening up its

confidential books and finances to Citadel for it to evaluate.  The primary purpose

of the Confidentiality Agreement was to limit the potential use of such "evaluation

material" by Citadel, unless Hawaiian Host gave written approval.  In this regard,

the Confidentiality Agreement provides in part:

> 2.  Use of Evaluation Material and Confidentiality.  The Receiving Party hereby agrees that it and its Representatives shall use the Evaluation Material of the Disclosing Party solely for the purpose of evaluating a Possible Transaction and for no other purpose, that the Evaluation Material of the Disclosing Party will be kept strictly confidential in accordance with the terms of this Confidentiality Agreement, that the Receiving Party will not use the Evaluation Material of the Disclosing Party in connection with any transaction or proposed transaction to which the Disclosing Party does not give its written approval, and that the Receiving Party and its Representatives will not disclose any of the Evaluation Material of the Disclosing Party in any manner whatsoever[.]

ECF No. 16-9 at 2, PageID.434.

The Confidentiality Agreement also allowed Hawaiian Host to negotiate with other potential investors and terminate discussions with Citadel at any time before a "definitive agreement" was reached with Citadel.  In particular, it provides in part:

> You [Citadel] understand and agree that no contract or agreement providing for any Possible Transaction currently exists and none shall be deemed to exist between you and the Company [Hawaiian Host] unless and until a final definitive agreement has been executed and delivered with the intention of being legally binding . . . . You also agree that unless and until a final definitive agreement regarding a Possible Transaction has been executed and delivered with the intention of being legally binding, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to such a Possible Transaction . . . . You further acknowledge and agree that the Company reserves the right, in its sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to a Possible Transaction, and to terminate discussions and negotiations with you at any time.

*Id.* at 5, PageID.437.  It also contained broad provisions for remedies for potential breaches, including legal fees and costs incurred by the non-breaching party, *id.* at 5–6, PageID.437–38 (discussed later in this Order), as well as a clause requiring arbitration "[i]f any dispute arises concerning the interpretation or enforcement of this Confidentiality Agreement[.]"  *Id.* at 6, PageID.438.

Discussions continued amongst Citadel, Hawaiian Host, and First Hawaiian, first with Citadel proposing an acquisition of Hawaiian Host, and later with a possible arrangement for Citadel to obtain the First Hawaiian loans directly and then foreclose on Hawaiian Host's secured assets.  An important aspect of the latter proposal was the negotiation of a "Cooperation Agreement" between Hawaiian Host to, as Hawaiian Host describes it, "protect its various stakeholders under this new deal structure," ECF No. 27 at 14, PageID.1893, such as "its unsecured creditors, employees, union, and trade partners," *id.* at 15, PageID.1894.

The parties were apparently close to an agreement, but Hawaiian Host notified Citadel in September 2020 that it would not be going forward with a deal with Citadel, and would instead be entering a transaction with another bidder.  *See* ECF No. 27-21.  Nevertheless, Citadel went forward with a transaction to acquire the loans from First Hawaiian, purportedly without obtaining Hawaiian Host's written approval and without a binding Cooperation Agreement.

**C.    Hawaiian Host Demands Arbitration**

Hawaiian Host considered Citadel's transaction with First Hawaiian to be the result of a breach or breaches of the Confidentiality Agreement, and filed a Demand for Arbitration on October 31, 2020.  *See* ECF No. 12-1 at 6, PageID.75. The arbitration demand made claims against Citadel for (1) Breach of the

Confidentiality Agreement; (2) Tortious Interference with Prospective Business

Opportunity; (3) Violation of HRS § 480-2, Unfair Methods of Competition;

(4) Unjust Enrichment; (5) Declaratory Relief; and (6) Injunctive Relief.  *Id.*

         On January 7, 2021, the Arbitrator granted an emergency Motion for

Preliminary Injunction brought by Hawaiian Host, finding that Hawaiian Host "is

likely to prevail on the merits," "[t]he risk of irreparable harm favors issuing the

injunction," and "[t]he public interest supports the injunction."  ECF No. 16-22 at

3–4, PageID.660–61.  His injunction:

> prohibits Citadel from taking any action that would
> impair, reduce, encumber, or affect in any way, any and
> all security or other collateral interest that Citadel
> acquired from First Hawaiian Bank . . . related to
> Hawaiian Host.  This includes but is not limited to the
> transfer, sale, or foreclosure upon any Hawaiian Host
> personal property, real property, assets, accounts
> receivables, stocks, business, and/or other collateral
> during the pendency of the Arbitration proceeding until
> the Final Arbitration Award is issued or unless further
> ordered by the Arbitrator.

*Id.* at 4, PageID.661.  He emphasized that his findings "are without prejudice and

may change at the time of the Final Award once the evidentiary hearing is

completed."  *Id.* at 5, PageID.662.  And he told the parties "the Arbitrator may find

after hearing all the evidence that Hawaiian Host had unclean hands in the

negotiations with Citadel, or otherwise ratified or consented to the FHB Credit

Agreement and Loans Purchase and Assignment Agreement." *Id.* at 5–6,

PageID.662–63.

Later, on July 16, 2021, ruling on cross-motions for summary

judgment, the Arbitrator made the following factual findings:

> b.  The Confidentiality Agreement is an enforceable contract.

> c.  [Citadel] received and used Hawaiian Host's "Evaluation Material" in connection with its purchase of the Hawaiian Host debt from First Hawaiian Bank.

> d.  The Debt Purchase Agreement (FHB Credit Agreement and Loans Purchase and Assignment Agreement) was a transaction for which the Receiving Party (Citadel) under the Confidentiality Agreement would be required to obtain the Disclosing Party's (Hawaiian Host's) written approval.

> e.  While the Cooperation Agreement was not required under the Confidentiality Agreement as the vehicle through which written approval would be documented, over the course of time it was the document the parties contemplated would be used to document Hawaiian Host's written approval to Citadel's debt purchase from First Hawaiian Bank.  There is a question of fact as to whether written approval was provided in a document(s) other than the Cooperation Agreement.

> f.  The parties' course of conduct contemplated a two-step approach to reaching an agreement between Hawaiian Host and Citadel - step one was for Citadel to obtain a preliminary agreement with First Hawaiian Bank on acquiring Hawaiian Host's debt from First Hawaiian Bank ("Debt Purchase Agreement"), and step two was

for the parties to enter into a Cooperation Agreement
which would contain not only the written approval for the
Debt Purchase Agreement, but also the other terms by
which Citadel would assist Hawaiian Host in working its
way out its financial difficulties in exchange for certain
other consideration from Hawaiian Host.  While the
parties worked on steps one and two simultaneously, the
parties never reached an agreement on the Cooperation
Agreement.

ECF No. 12-1 at 6–8, PageID.75–77.

Arbitration hearings were held from October 2021 into December
2021, focusing on whether Citadel had breached the Confidentiality Agreement,
and whether it had obtained written consent from Hawaiian Host for Citadel's
acquisition of the First Hawaiian loans, as well as on potential remedies for a
breach.

## D.    The Final Arbitration Award

On February 10, 2022, the Arbitrator issued his award, followed by an
amended Arbitration Award on March 29, 2022, which corrected typographical
errors.  ECF No. 12-1.  To summarize, the Arbitrator found and concluded that
"Hawaiian Host has shown by a preponderance of the evidence that Citadel
breached the Confidentiality Agreement by failing to obtain Hawaiian Host's
written approval to purchase Hawaiian Host's loans from First Hawaiian Bank . . .
and Central Pacific Bank."  *Id.* at 8, PageID.77.  He found that "[n]one of the

documents identified by Citadel, individually or collectively, constitute written

approval from Hawaiian Host under the Confidentiality Agreement," and that

"Citadel has not met its burden of proof on its affirmative defenses." *Id.* He then

awarded damages as follows:

> [1.]    [B]reach of contract damages in the amount of
> $6,634,477.00 for breaching the Confidentiality
> Agreement. The damages ($6,634,477.00) represent the
> difference between the par value of the loans as of
> October 1, 2020 ($33,12,383.27) and the book value of
> the loans (par value less 20%) or $26,537,906.00.
> Citadel prevented Hawaiian Host the opportunity to
> extinguish the loans at less than par value when it
> illegally purchased the loans.

*Id.* at 9, PageID.78.

> [2.]    The Arbitrator also finds that because Citadel illegally
> obtained the FHB/CPB loans[,] that it was not entitled to
> collect interest and profit from the illegal transaction.
> Citadel also prevented Hawaiian Host from extinguishing
> the loans through an outside investor which would have
> stopped the accruing of interest. The Arbitrator awards
> to Hawaiian Host and against Citadel the sum of
> $1,415,578.00 for interest illegally obtained from
> October 1, 2020, to February 11, 2022.

*Id.* at 10, PageID.79.

> [3.]    The Arbitrator also awards operational damages in the
> amount of $2,033,677.00 for breaching the
> Confidentiality Agreement. But for Citadel's illegal
> purchase of the FHB/CBP loans, Hawaiian Host would
> have been able to obtain an infusion of working capital to
> prevent losses in missed or short shipments. As a result

24

of the inability to recapitalize, Hawaiian Host was unable
to maintain proper levels of finished goods, raw
chocolate and packaging, and as a result lost out in
profits of $2,033,667.00 as a result of missed or short
shipments.

*Id.*

He also awarded "declaratory relief" under Count 5, finding and

concluding that:

Hawaiian Host has shown by a preponderance of the
evidence that it is entitled to declaratory relief as follows:

1.  Any and all security or other collateral interests that
Citadel acquired from the Banks related to Hawaiian
Host was in violation of the Confidentiality Agreement
between Hawaiian Host and Citadel.

2.  Any security or other collateral interests that Citadel
obtained related to Hawaiian Host through the FHB
Credit Agreement and Loans Purchase and Assignment
Agreement, dated October 1, 2020 ("LPAA"), including,
but not limited to, any security interest in Hawaiian
Host's personal property, real property, assets, accounts,
receivables, stocks, business, or collateral of any kind or
type whatsoever is terminated.

*Id.* at 12, PageID.81.

He also made the following award of injunctive relief under Count 6:

Hawaiian Host has shown by a preponderance of the
evidence that it is entitled to continued injunctive relief
up through May 11, 2022.  In light of Citadel's purchase
of the loans in violation of the Confidentiality
Agreement, in order to return the parties to the status quo

25

> ante, Citadel is directed to act in good faith and release
> the liens and any other interests associated with the
> LPAA.  Citadel is further prohibited from taking any
> action that would impair, reduce, encumber, or affect, in
> any way, any and all security or other collateral interests
> that Citadel acquired from the Banks through the LPAA
> related to Hawaiian Host.  Citadel is also prohibited from
> collecting any further principal or interest payments from
> Hawaiian Host on any of the loans Citadel acquired
> under the LPAA, nor is Citadel permitted to enforce any
> of the provisions of the Credit Agreement 1 or any of the
> other loan documents it acquired under the LPAA against
> Hawaiian Host until and after May 11, 2022, if and only
> if the loans are not paid off or purchased on or before this
> date.  As stated below, the payoff amount for the loans
> acquired under the LPAA by order of the Arbitrator is
> $14,274,838.00.  The above-stated prohibition of against
> Citadel from any enforcement of the LPAA against
> Hawaiian Host includes any action against Hawaiian
> Host from bringing in outside investors to infuse working
> capital into the company or to purchase or pay off the
> loans.

*Id.* at 12–13, PageID.81–82 (footnote omitted).

He also awarded legal fees and costs against Citadel totaling

$1,937,736, as well as prejudgment interest of "$6,634,477.00 from October 1,

2020, to February 11, 2022 (499 days), plus every day thereafter until paid." *Id.* at

14, PageID.83.  He further explained:

> The daily rate is $1,817.66 per day ($6,634,477.00/365
> days).  The total amount for prejudgment interest up
> through February 11, 2022, is $907,012.34 (499 x
> $1,817.66).  Interest at the rate of $1,817.66 per day shall

be assessed for every day after February 11, 2022, until
fully paid.

*Id.*

He summarized the total award of damages as $12,928,469.00.  *Id.* at

15, PageID.84.  And he gave the following instructions:

> The total award of $12,928,469.00 shall be deducted from
> the current principal owed on all loans obtained by
> Citadel ($27,203,307.00) for a net loan balance as of
> February 11, 2022, in the amount of $14,274,838.00.
> Citadel shall take no action on its loans and shall not be
> entitled to collect principal or interest for a period of 90
> days from February 11, 2022, through May 11, 2022.
> Hawaiian Host or its assignee by way of an outside
> investor shall pay off or purchase the loan balance of
> $14,274,838.00 on or before May 11, 2022, or Hawaiian
> Host must begin making principal and interest payments
> on the loan balance of $14,274,838.00 on May 12, 2022.

*Id.*  Essentially, Citadel holds the loans, subject to those conditions, with the idea

that Hawaiian Host or a new investor would purchase the loans.  If not purchased

or paid off by May 12, 2022, Hawaiian Host would assume making payments on

the loans.

Hawaiian Host filed its Motion to Confirm and for Entry of Judgment

in State Court on February 14, 2022.  ECF No. 1-2.  Citadel removed that

proceeding to this court on February 25, 2022, ECF No. 1, with an amendment to

the Notice of Removal filed on June 6, 2022, ECF No. 52.  The court held a

hearing on the Motion to Confirm and Counter-Motion to Vacate on August 15, 2022, ECF No. 60, and the parties filed supplemental memoranda in August and September of 2022, *see* ECF Nos. 62, 68, and 73.

## IV.  DISCUSSION

### A.      The Article V and 9 U.S.C. § 10(a) Factors

As provided in 9 U.S.C. § 207, the court addresses Article V's seven grounds for refusing to recognize or enforce the Arbitration Award.[8]  The court first briefly addresses Articles V(1)(a), V(1)(d), V(2)(a), and V(2)(b) because they have little possibility of applying.  The court then addresses Article V's other grounds, and in so doing, discusses some of the specific factors in 9 U.S.C. § 10(a) that overlap with the remaining Article V grounds.  Following that, the court discusses any other factors in 9 U.S.C. § 10(a).

---

[8] The parties have not specifically briefed the Article V factors.  But they have filed extremely comprehensive memoranda addressing all the general standards under 9 U.S.C. § 10(a) and more, including specific briefing about a mediation privilege, and two sets of briefing addressing Hawaiian Host, Inc.'s merger with Hawaiian Host, LLC and Citadel's related claim of fraud.  *See* ECF Nos. 1, 16, 27, 32, 34, 37, 44, 45, 55, 58, 62, 68, and 73.  The factors in Article V and 9 U.S.C. § 10(a), although different, overlap in many respects and complement each other in substance.  The existing briefing is more than adequate for the court to assess the Article V factors.  Moreover, the record, consisting of thousands of pages of arbitration exhibits and pleadings, is certainly sufficient for the court to perform its "extremely limited" review of the Arbitration Award under Article V.  *See Kyocera Corp.*, 341 F.3d at 998.

### 1.   *Article V(1)(a)—Agreement not Valid*

Under Article V(1)(a), a court may refuse to enforce an award if

"[t]he parties to the agreement . . . were . . . under some incapacity, or the said

agreement is not valid under the law to which the parties have subjected it . . . ."

Nothing in the record indicates that any party to the Confidentiality Agreement

suffered from any incapacity or that the Confidentiality Agreement was not valid

under Hawaii law.

At best, Citadel's arguments regarding Hawaiian Host, Inc.'s merger

with Hawaiian Host, LLC—discussed later in this Order—might be construed as

challenging Hawaiian Host, LLC's "capacity" to confirm the Arbitration Award

(e.g., Citadel argues that Hawaiian Host, LLC lacks standing).  But Article V(1)(a)

is concerned with the capacity to *enter* into the subject contract (here, the

Confidentiality Agreement), not with the capacity to confirm an award.  *See, e.g.*,

*OJSC Ukrnafta*, 957 F.3d at 497–98 (explaining that "Article V(1)(a) extends

broadly to all issues concerning the validity of the agreement referred

to in Article II [of the New York Convention], including issues of capacity,

existence, and validity" (citation and quotation marks omitted)).  The

Confidentiality Agreement was a valid agreement between Hawaiian Host, Inc.,

and Citadel Pacific Ltd., effective July 16, 2020.  *See* ECF No. 16-9 at 7,

PageID.439.  The agreement chose Hawaii law, and it contained the arbitration clause that led to the Arbitration Award.  *See id.* at 6, PageID.438.  Article V(1)(a) does not apply.

### 2.      *Article V(1)(d)—Composition of Panel; Arbitral Procedure*

Next, Article V(1)(d) allows a court to refuse to confirm if "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ."  Here, the Confidentiality Agreement provided for a "single arbitrator," and an arbitration "governed by the [AAA's] Rules."  ECF No. 16-9 at 6, PageID.438.  The parties later also agreed to arbitration with DPR, governed by the AAA Commercial Arbitration rules.  *See* ECF No. 16-8 at 2, PageID.430.  They agreed to exactly what occurred.  *See* ECF No. 12-1 at 4, PageID.73.  Article V(1)(d) does not apply.

### 3.      *Article V(2)(a)—Subject Matter of Arbitration*

Article V(2)(a) specifies that a court may refuse to enforce an award if a "competent authority" has found that "[t]he subject matter of the difference is not capable of settlement by arbitration . . . ."  Here, no one is arguing that the subject matter of the dispute—a breach of the Confidentiality Agreement—is not arbitrable.  *Cf. Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974) ("Under this

provision, a court sitting in the United States might, for example, be expected to decline enforcement of an award involving arbitration of an antitrust claim in view of domestic arbitration cases which have held that antitrust matters are entrusted to the exclusive competence of the judiciary."); *Purus Plastics GmbH v. Eco-Terr Distrib., Inc.*, 2018 WL 3064817, at *5 (W.D. Wash. June 21, 2018) ("[A] party contesting confirmation [under V(2)(a)] fails to establish this ground for relief when '[t]here is no special national interest in judicial, rather than arbitral, resolution of the . . . claim underlying the award.'" (quoting *Parsons & Whittemore Overseas Co.*, 508 F.2d at 975)).

Additionally, the parties stipulated that the DPR arbitrator would have the power to grant injunctive relief, ECF No. 16-8 at 2, PageID.430, and that "the Arbitrator shall determine all issues submitted to arbitration by the parties and may grant any and all remedies that the Arbitrator determines to be just and appropriate under the law," ECF No. 27-27 at 1, PageID.2214.  Accordingly, Article V(2)(a) does not apply.

### 4.   *Article V(2)(b)—Public Policy*

The seventh Article V factor allows a court to refuse to confirm an award if "recognition or enforcement of the award would be contrary to the public policy of" the country in which confirmation is sought.  New York Convention,

Article V(2)(b). "The public policy defense is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *TermoRio S.A. E.S.P.*, 487 F.3d at 938. "The defense applies to only violations of an 'explicit public policy' that is 'well-defined and dominant' and is ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Cvoro v. Carnival Corp.*, 941 F.3d 487, 496 (11th Cir. 2019) (quoting *Indus. Risk Insurers*, 141 F.3d at 1445). Although this defense is frequently raised, it "has rarely been successful." *Cubic Def. Sys., Inc.*, 665 F.3d at 1097 (citation omitted). "Erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004) ("*Karaha Bodas II*").

The term "public policy" in Article V(2)(b) might be read to encompass (or overlap) with other Article V provisions such as a generalized right to basic due process, or an arbitrator exceeding its jurisdiction. But those grounds are analyzed to follow under Articles V(1)(b) and V(1)(c). The violation of public policy must be something different. And no such policy is implicated here with this commercial dispute between sophisticated business entities, even if a large

amount of money is at stake.  Nothing in Citadel's challenge implicates Article V(2)(b).

5. *Article V(1)(b)—Notice and Opportunity to Present Case (Due Process)*

Under Article V(1)(b), a court may deny enforcement if "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was unable to otherwise present his case."  This section "essentially sanctions the application of . . . United States standards of due process."  *Karaha Bodas II*, 364 F.3d at 298.  An arbitration hearing must "meet[] the minimal requirements of fairness—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator," with the parties having had "an opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.* at 299 (quotation marks omitted).  "The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure."  *Id.* (footnote omitted).  "This provision does not authorize a court to refuse to recognize or enforce an award unless it finds a denial of fundamental fairness in the arbitration proceedings."  *Bartlit Beck LLP v. Okada*, 25 F.4th 519, 523 (7th Cir. 2022)

The court construes this due process ground under Article V(1)(b) as encompassing Citadel's arguments (made when analyzing factors under 9 U.S.C.

33

§ 10(a)(2) and (a)(3), *see* ECF No. 16-1 at 29−37, PageID.140−148) that:

(a) the Arbitrator exhibited "evident partiality" by refusing to disqualify himself after certain events occurred during the arbitration;

(b) the Arbitrator committed misconduct by refusing to postpone the arbitration hearing after Hawaiian Host's purportedly late production of certain documents;

(c) the Arbitrator proceeded with the hearing (and subsequently issued the Arbitration Award) after Citadel told the Arbitrator that the parties had reached a settlement on the eve of commencement of the arbitration hearings; and

(d) the Arbitrator awarded damages based on legal theories that the Arbitrator had previously dismissed at a summary-judgment stage of the proceedings—Citadel claims that because of this "misconduct," it "did not have notice that it needed to present evidence of these [dismissed] claims and rebut these damages at the Hearing," *id.* at 43, PageID.148. *See, e.g.*, *Bartlit Beck LLP*, 25 F.4th at 523 (reasoning that 9 U.S.C. § 10(a)(3) "has been interpreted similarly to Article V(1)(b)," including "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy"); *Parsons & Whittemore*

*Overseas Co.*, 508 F.2d at 976 (analyzing under V(1)(b) whether an arbitration tribunal acted within its discretion in declining to reschedule a hearing).

The court addresses these four arguments in turn.

      a.    *Evident Partiality*

During the arbitration proceedings, Arbitrator Feldman was solicited for a paid position as a mediator for an unrelated case. An attorney (William Meheula) who is affiliated with one of Hawaiian Host's transactional attorneys (Barry Sullivan) was involved in that unrelated case, although Mr. Meheula apparently did not personally solicit the Arbitrator. *See* ECF No. 16-35 at 13, PageID.745. Mr. Meheula may also have been an attorney for some Hawaiian Host matters. *See, e.g.*, ECF No. 16-32 at 1, PageID.688; ECF No. 16-37 at 5, PageID.795. On May 20, 2021, the Arbitrator disclosed the solicitation, telling counsel for both sides, through DPR:

> This is a supplemental disclosure.
>
> I have been asked to serve as a mediator in a new matter where William Meheula represents one of the parties. Barry Sullivan is not involved but is in the same firm as Mr. Meheula. Since Mr. Sullivan will be a witness in the Hawaiian Host case, I am making this supplemental disclosure.
>
> I reaffirm that I can be a fair and impartial Arbitrator.

ECF No. 16-31 at 1, PageID.686.

Citadel objected, and moved—with DPR, not with the Arbitrator—to disqualify the Arbitrator.[9]  An arbitrator is apparently not supposed to know which party, if any, is seeking his or her disqualification, but Hawaiian Host inadvertently included the Arbitrator on an email to DPR that contained its opposition to Citadel's disqualification request (and thus the Arbitrator presumably could then tell that Citadel had objected).  *See* ECF No. 16-35.  Citadel then replied to "all," thus further including the Arbitrator on matters regarding the request to disqualify.  ECF No. 16-37 at 6, PageID.796.  The Arbitrator, through DPR, responded with a further disclosure and a notification to both sides that he would not be serving as a mediator in that unrelated matter:

> Certain emails came my way with a reference to Objections to the Arbitrator or something to that effect in the Subject line.  I immediately asked DPR whether that is something I should open and read and DPR said no, that is an administrative matter being handled by DPR.  I did not open any of the emails, and I don't even know which party is objecting or the basis for the objection.  This will confirm that those emails in no way will impact my decision to be fair, objective and impartial in this arbitration.
>
> This also confirms that I will not serve in the mediation recently submitted to me involving the Meheula firm.

---

[9] Although the disqualification request occurred before the arbitration hearings began, it was well after the Arbitrator had issued his January 7, 2021 Order Granting Hawaiian Host's Motion for Preliminary Injunction, ECF No. 16-22, which found, among other things, that "Hawaiian Host is likely to prevail on the merits," *id.* at 3, PageID.660.

ECF No. 16-36 at 1, PageID.789.

DPR—not the Arbitrator—considered the parties' briefing and issued an order denying Citadel's request to disqualify the Arbitrator. In a written order, DPR analyzed the events and found no grounds for disqualification, and specifically found that the facts did not "create a reasonable impression of partiality." ECF No. 16-38 at 4, PageID.840.

Citadel argues to this court that the Arbitration Award should be vacated (i.e., not be confirmed or recognized) because of "evident partiality." ECF No. 16-1 at 37, PageID.142. Citadel contends that the circumstances, even if not demonstrating actual bias, are enough to demonstrate the "appearance of an arbitrator's bias," which it claims is enough to demonstrate evident partiality. *See id.* (quoting *Schmitz v. Zilveti*, 20 F.3d 1043, 1046–47 (9th Cir. 1994)). It claims it would not have agreed to Mr. Feldman as the Arbitrator if it knew at the outset that Mr. Meheula and the Arbitrator "were then in an ongoing economic relationship." *Id.* at 38, PageID.143.[10]

---

[10] Previously, the Arbitrator had likewise disclosed that the Dentons firm, which represents *Citadel*, had selected him to serve as a mediator on other unrelated matters. *See* ECF No. 16-35 at 49, PageID.781. Hawaiian Host did not object to those disclosures.

The court rejects Citadel's claim of "evident partiality." To establish evident partiality under the FAA, Citadel "must establish specific facts indicating actual bias toward or against a party or show that [the Arbitrator] failed to disclose to the parties information that creates a reasonable impression of bias." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 645–46 (9th Cir. 2010) (citation and editorial marks omitted). Here, neither of those requirements is met. First, there is nothing reasonably indicating *actual* bias.[11] Second, the Arbitrator made very specific disclosures. He then declined to serve as a mediator in the disclosed matter. The objective circumstances created no reasonable "impression of bias"—even if this were a question of *nondisclosure*. It would be pure speculation to think that the Arbitrator would be biased against Citadel because he might have lost other business by having to decline a different job as a mediator in the unrelated matter. The circumstances certainly do not rise to a "denial of fundamental fairness." *See Bartlit Beck LLP*, 25 F.4th at 523.

---

[11] When Citadel sought disqualification, it argued to DPR only that the circumstances created an "impression of bias," and it specifically *disavowed* that it was asserting "actual bias." *See* ECF No. 16-32 at 2 n.2, PageID.689 (Citadel noting to DPR that "[t]o be clear, Citadel is NOT claiming that Arbitrator Feldman is actually biased"). Citadel now (improperly) makes a different argument to this court, arguing actual bias—at least in its Reply memoranda, *see* ECF No. 37 at 18, PageID.2537 (arguing that "[v]acatur is warranted because the Arbitrator demonstrated actual bias . . .")). In any event, there is no proof of actual bias on the part of Arbitrator Feldman.

    b. *Refusal to Postpone Hearing After Claimed Discovery Abuse*

   Citadel claims that, after Hawaiian Host "abused the discovery

process," the Arbitrator committed misconduct by refusing to continue the

arbitration hearings and thus prejudiced Citadel.  *See* ECF No. 16-1 at 39,

PageID.144.  The court disagrees.

   The four-week arbitration hearing (occurring in stages over eight

weeks) began on October 25, 2021.  The formal discovery phase of the arbitration

ended on September 17, 2021.  During discovery, Hawaiian Host claimed that

certain documents were privileged.  After considering a motion to compel by

Citadel, the Arbitrator found certain documents were not privileged and also

ordered Hawaiian Host to produce (or supplement) a particular privilege log by

September 1, 2021.  *See* ECF No. 16-28.  After in camera review by the Arbitrator

(*see* ECF No. 16-43 at 1, PageID.948), Hawaiian Host produced some 1,200 pages

of documents approximately one month before the first scheduled day of the

arbitration.  *See, e.g.*, ECF No. 27-1 at 4, PageID.1928.  Many of those documents

apparently were included in email strings that may have already been disclosed, or

were redundant as redacted versions of other known documents.  *See id.* at 7−8,

PageID.1931−1932.  Meanwhile, Citadel had filed a motion regarding several

other discovery-related topics (*see* ECF No. 25-1), and that motion also sought an

unspecified "further continuance of the hearing date," based in part on a purported need for a further deposition triggered by the newly disclosed documents.  *Id.* at 6, PageID.1223.  The Arbitrator denied a further continuance.

Citadel has failed to prove that the Arbitrator's refusal to continue the hearing was "misconduct," was "fundamentally unfair," or was a denial of Citadel's basic due process rights.  The Arbitrator considered Hawaiian Host's arguments that Citadel's motion was "a desperate pretense to move the arbitration hearing," ECF No. 27-49 at 3, PageID.2368, and that the recently produced documents were, relatively speaking, not of critical importance, *id.* at 19–20, PageID.2384–2385.  The Arbitrator knew the procedural posture of the case, the contents of the documents he had just reviewed in camera, and the context (within the framework of the arbitration as a whole) of the recent production of documents. The arbitration had already been postponed once, and the Arbitrator had already issued at least 20 prehearing orders on various matters.  *See* ECF No. 16-29 ("Pre-Hearing Order No. 20").

Under these circumstances, the scheduling of the arbitration hearing was clearly a matter of the Arbitrator's discretion, as he would have had any number of reasons not to postpone its commencement.  *See, e.g., El Dorado Sch. Dist. No. 15 v. Continental Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) ("Courts

will not intervene in an arbitrator's decision not to postpone a hearing if any reasonable basis for it exists."); *id.* (finding no misconduct, reasoning that the arbitrator reasonably could have determined "that postponement was inappropriate because the parties had expended considerable time, effort and money based on the hearing dates"); *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir. 2006) ("[Petitioner] was not denied a fair hearing because the record supports several bases on which the [arbitration] panel reasonably could have denied him a continuance."); *CM S. E. Texas Houston, LLC v. CareMinders Home Care, Inc.*, 662 F. App'x 701, 704–05 (11th Cir. 2016) (reiterating that "[t]o establish misconduct, the party moving for vacatur must show that there was no reasonable basis for the arbitrator's refusal to postpone the hearing," and allowing an arbitrator to consider "not only the convenience of both parties and their witnesses, but his convenience as well," as well as "the need to ensure expeditious resolution of the case" (citations and some internal marks omitted)).  Even with a complex arbitration, there was nothing unfair about the Arbitrator's refusal to delay the proceedings further, especially given sophisticated corporate parties represented by experienced commercial litigators.  As Hawaiian Host points out, the arbitration hearings took place over eight weeks (allowing adequate time for Citadel to consider new discovery), and where, under the AAA's commercial arbitration

41

rules, depositions are generally only permitted in "exceptional circumstances." ECF No. 27 at 41, PageID.1920 (quoting AAA Rule L-3(f)).[12]

In short, neither the refusal to postpone commencement of the hearings nor any "late" disclosure of documents, denied Citadel's fundamental due process rights, and are not grounds for this court to refuse confirmation (nor grounds for vacatur).

> c.   *Refusal to Postpone the Hearing Despite Citadel's Eve-of-Hearing Contention that the Parties had Reached a Settlement*

Citadel also argues that "[i]t was misconduct for the Arbitrator to proceed with the hearing knowing that the parties had settled." ECF No. 16-1 at 41, PageID.146. The court rejects this strange argument—Citadel has failed to demonstrate that the Arbitrator committed misconduct by proceeding with a complex, four-week arbitration (vigorously litigated by the parties) all the while knowing of a binding settlement of the dispute between the parties.

---

[12] Rule L-3(f) provides:

> In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

AAA, Commercial Arbitration Rules and Mediation Procedures (Effective September 1, 2022), *available only at* adr.org/Rules (last visited Oct. 31, 2022).

Concurrent with the arbitration proceedings, the parties were attempting to resolve their differences through an ongoing mediation with a retired state court judge, Joel August, as mediator.  Citadel's counsel attests that on October 22, 2021, the mediator made a proposal for global settlement "which both Citadel and [Hawaiian Host] accepted, in writing, on October 23, 2021."  ECF No. 16-2 at 56, PageID.208.  Citadel states that "[Hawaiian Host] purported to rescind its acceptance on October 24, 2021, which was not recognized by Citadel or the settlement officer."  *Id.* at 56–57, PageID.208–09.  Citadel's counsel declares that "Citadel did not rescind and instead put the fact of the Settlement on the record of the [arbitration] Hearing."  *Id.* at 57, PageID.209.  Counsel then attests to the following as fact to this court:

> Knowing that the parties had reached a settlement, the Arbitrator nevertheless proceeded with the hearing, over Citadel's objection . . . .  Citadel had no choice but to proceed with the hearing to attempt to mitigate any damages resulting from the breach of the Settlement Agreement.

*Id.*

Counsel for Citadel blatantly misrepresents the record to this court. What happened at the arbitration hearing is actually much different.  On October 25, 2021 (the first day of the hearings), immediately before the first witness was to be sworn, Mr. Alston asked to make a statement, and the following occurred:

MR. ALSTON:  Before [we begin], Kale, I have a statement I need to make.

THE ARBITRATOR:  Sure.

MR. ALSTON:  On Friday both parties received a mediator's proposal.  That mediator's proposal was accepted by both parties.  Subsequently Hawaiian Host attempted to rescind its approval.  We are proceeding today without prejudice to our position that there is, in fact, a settlement in place.  It's not an issue you need to resolve today.  But it's, it does affect the potential impact.  It has a significant potential impact on the proceedings.

THE ARBITRATOR:  So you want the record to reflect that you're moving forward under objection taking the position that you feel there is a binding settlement in place?

MR. ALSTON:  We do. Yes.

THE ARBITRATOR:  Understood the stipulation.

MR. ALSTON:  We are not waiving that position by proceeding.

MR. COX:  And, Paul, obviously this is Joachim, I think everything was just identified as inappropriate and is protected under the mediation privilege that has now been violated by Citadel.  Obviously, there has been a number of communications as to what occurred and Citadel's failure to timely respond and not provide any update.  Those issues are quite clear on the record that there, in fact, is no settlement. And so we similarly would object to any suggestion that there is a reservation on the part of Citadel in proceeding forward today.

> THE ARBITRATOR:  Let's move forward.  Both sides
> have presented their position on the record.  Just for the
> record, I know nothing of any settlement.  I know
> nothing of any mediation.  I don't even know that there --
> I don't even know they had a mediator.  Let's move
> forward with the first witness.  Good morning, Mr.
> Schultz.

ECF No. 25-2 at 4−6, PageID.1263−65.

Contrary to counsel's attestation, the Arbitrator did not "[k]now[] that the parties had reached a settlement."  Contrary to counsel's attestation, the Arbitrator did not "nevertheless proceed[] with the hearing, over Citadel's objection."  And, it is thus extremely misleading for counsel to attest that Citadel "had no choice but to proceed with the hearing to attempt to mitigate any damages resulting from the breach of the Settlement Agreement."

Rather, Citadel was "*proceeding* today without prejudice to [its] position that there is, in fact, a settlement in place," *id.* at 4–5, PageID.1263–64 (emphasis added).  It was placing an objection on the record, but not asking for a continuance.  Citadel told the Arbitrator it was "not an issue you need to resolve today."  *Id.* at 5, PageID.1264.  And the Arbitrator—after also considering the response by Hawaiian Host's counsel—specifically stated for the record that he "kn[ew] nothing of any settlement," and "kn[ew] nothing of any mediation."  *Id.* at 6, PageID.1265.  The actual exchange at the hearing belies any contention that

45

Citadel was forced to proceed with the hearing in order to "mitigate any damages" resulting from a breach. Nothing in Citadel's statement to the Arbitrator indicates it wanted him to postpone—much less that he should have postponed—the hearing. Citadel cannot claim that the Arbitrator committed misconduct by not postponing the hearing when it did not ask him to postpone it, and when he "kn[ew] nothing of any settlement." *Id.* The court is unaware of any motion to enforce a settlement agreement made during the arbitration.[13]

Notably, Citadel is not claiming in this confirmation/vacatur action that *this court* cannot, or should not, proceed because the matter was already settled. Rather, the issue here is whether the *Arbitrator* committed misconduct by proceeding with the arbitration hearings despite allegedly knowing of a settlement between the parties. But, again, the Arbitrator had no actual evidence of a settlement. The court can review the Arbitrator's actions based on only the record that was before him. *See, e.g., JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Loc. 103*, 324 F.3d 42, 50 (1st Cir. 2003) ("[A] court reviews the merits of the arbitral decision based on the record before the arbitrator under a narrow standard of review . . . ."); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*,

---

[13] It was not until June 17, 2022, that Citadel filed suit in this court for breach of a settlement agreement. *See Citadel v. Hawaiian Host LLC*, Civ. No. 22-00276 JMS-WRP (D. Haw. June 17, 2022).

453 F. Supp. 3d 1, 7 n.5 (D.D.C. 2020) ("[W]hen reviewing an arbitral award, a court may only consider the decision and the record *before the arbitrator*. The Court thus fails to see how testimony that was not presented . . . bears on whether [the] award was erroneous." (citation and quotation marks omitted)).[14]

In short, there was no misconduct, and no denial of due process under Article V(1)(b), when the Arbitrator proceeded with the arbitration after Citadel put an objection on the record on October 25, 2021.

### d. *Award of Damages on Dismissed Legal Theories*

At a motions-stage of the arbitration, the Arbitrator granted summary judgment (among other rulings) and dismissed Hawaiian Host's claims for

---

[14] In "Exhibit 45," ECF No. 26 (sealed), Citadel proffers an email or emails regarding the mediation—apparently as support for its position that an eve-of-hearing settlement was reached. *See* ECF No. 16-1 at 41, PageID.146 (arguing about Exhibit 45's contents). Hawaiian Host moved to strike Exhibit 45, claiming it is inadmissible based on a mediation privilege, and should not have been submitted to the court. ECF No. 20 at 5–6, PageID.1202–03. Similar objections about a mediation privilege were made to other documents. *See* ECF No. 46.

Whether a mediation privilege might apply, in turn, raises questions about whether state or federal law applies under Federal Rule of Evidence 501—and the parties submitted briefing on those questions. *See* ECF Nos. 34, 45. After reviewing that briefing, the court sealed Exhibit 45, but ultimately declined to strike Exhibit 45, deferring a ruling on its admissibility because the court "need[ed] to consider Exhibit 45's admissibility in context when analyzing Citadel's arguments that the arbitration award must be vacated." ECF No. 53 at 3, PageID.3449. The court made similar rulings regarding two other documents. *See* ECF No. 54.

Now, better understanding the context, the court determines that it need not decide in this proceeding whether a mediation privilege applies. Again, the court is not deciding here whether there actually *was* a settlement. The question is whether the Arbitrator committed misconduct. The subject exhibits were never presented to the Arbitrator. Their existence, whether privileged or not, is not relevant towards determining whether the Arbitrator's failure to continue the proceedings was actionable "misconduct" under the FAA.

(1) tortious interference with prospective business opportunity, and (2) unjust enrichment.  *See* ECF No. 12-1 at 11, PageID.80.  The arbitration proceeded on Hawaiian Host's claims for breach of the confidentiality agreement and for declaratory and injunctive relief.

Citadel claims that the Arbitrator awarded "damages and disgorgement to [Hawaiian Host] based on" those dismissed legal theories.  ECF No. 16-1 at 43, PageID.148.  It argues that it relied to its detriment on the Arbitrator's summary judgment rulings and, thus, lacked notice of a need to present evidence on these claims.  *Id.*  It points, in particular, to the Arbitrator's award to Hawaiian Host of "$1,415,578.00 for interest illegally obtained" based on his finding that "Citadel illegally obtained the FHB/CPB loans" and thus "was not entitled to collect interest and profit from the illegal transaction."  ECF No. 12-1 at 10, PageID.79.  It contends this is an equitable remedy that must have been based on the (dismissed) claim of unjust enrichment.  *See* ECF No. 37 at 15, PageID.2534.

But, even if the Arbitrator's finding that Citadel's acquisition of the First Hawaiian loans was illegal *could* have been the result of "tortious interference," the finding was also part and parcel of Hawaiian Host's breach of contract theory.  The damages awarded and other relief were also recoverable

under the theories that were *not* dismissed—breach of the confidentiality agreement, and declaratory and injunctive relief. That is, the Arbitrator did not render his award based on dismissed legal theories. The award of interest was not necessarily "disgorgement" based on a dismissed theory, but was instead money that Hawaiian Host wrongfully paid to Citadel for a period when Citadel held the loans that—according to the Arbitrator's findings—Citadel had obtained illegally in breach of contract.

These are findings within the Arbitrator's province, especially considering that the parties specifically agreed that the Arbitrator "may grant any and all remedies that the Arbitrator determines to be just and appropriate under the law." ECF No. 27-27 at 1, PageID.2214. The Confidentiality Agreement's broad remedies clause specifically contemplated that "money damages alone may not be a sufficient remedy for any breach of this Confidentiality Agreement by either party. . . [and] [i]n the event of a breach . . . the non-breaching party shall be entitled to equitable relief, including injunction . . . without any requirement of posting bond or other security or proving irreparable harm." ECF No. 16-9 at 6, PageID.438. It states that "[s]uch remedies shall not be deemed to be the exclusive remedies for a breach of this Confidentiality Agreement but shall be in addition to all other remedies available under the contract, at law, or in equity to the non-

breaching party." *Id.*  Given the broad scope of the agreed-upon possible

remedies, the court sees nothing in the award that deprived Citadel of due process.

*See Karaha Bodas II*, 364 F.3d at 299.

### 6. *Article V(1)(c)—Beyond the Scope of the Submission*

Next, a court can refuse under Article V(1)(c) to confirm an

arbitration award if an award "deals with a difference not contemplated by or not

falling within the terms of the submission to arbitration, or contains decisions on

matter beyond the scope of the submission to arbitration . . . ."  Notably, this

ground does not allow a party to challenge "the substantive decision of the arbitral

tribunal on the merits of the parties' dispute."  *OJSC Ukrnafta*, 957 F.3d at 501.

Rather, "the Article V(1)(c) defense is much narrower, typically covering

challenges that the arbitration resolved disputes beyond those the parties

submitted."  *Id.*  This is because a court may not refuse confirmation based on an

arbitrator's "mistakes of law or fact."  *Karaha Bodas II*, 364 F.3d at 288.  Again,

"[a]bsent extraordinary circumstances, a confirming court is not to reconsider an

arbitrator's findings."  *Id.* (quotation marks omitted).

This ground encompasses Citadel's arguments that the Arbitrator

"exceeded his powers" by (1) "rewriting the credit documents," (2) "terminating

security interests established under the credit documents," and (3) "basing remedies on rewriting the credit documents."  ECF No. 16-1 at 2, PageID.107.  *See Parsons & Whittemore Overseas Co.*, 508 F.2d at 976  ("[Article V(1)(c)] tracks in more detailed form 10[(a)(4)] of the [FAA], 9 U.S.C. [§] 10[(a)(4)], which authorizes vacating an award 'where the arbitrators exceeded their powers.'").  Under the FAA, arbitrators exceed their powers "when the award is 'completely irrational' or exhibits a 'manifest disregard of law."  *Kyocera Corp.*, 341 F.3d at 997 (citation omitted).

The Arbitrator did not exceed his powers.  Contrary to Citadel's arguments, the Arbitrator did not "rewrite" credit documents (none of which contained arbitration clauses, and are apparently the subject of pending litigation in State Court)—he specifically based his award on a breach or breaches of the Confidentiality Agreement, and did not modify any obligations under credit documents.[15]  He based his award on a finding that Citadel had misused Hawaiian Host's financial information (or "evaluation material") to improperly or illegally obtain the loans from First Hawaiian, after finding that Citadel had not received proper written approval from Hawaiian Host.

---

[15] Citadel defines "credit documents" as "various credit agreements and mortgages that had no relationship to the Confidentiality Agreement."  ECF No. 16-1 at 7, PageID.112.

Indeed, the Arbitrator specifically recognized that he "has no jurisdiction over the FHB Credit Agreement terms and conditions and whether the parties (Hawaiian Host and Citadel) complied with those terms and conditions." ECF No. 12-1 at 10, PageID.79. But he awarded relief "on the basis that Citadel breached the Confidentiality Agreement by illegally taking an assignment of the Credit Agreement (and its various amendments) when it purchased the loans from FHB/CPB though the [Loans Purchase and Assignment Agreement] and then used the Credit Agreement to prevent Hawaiian Host from infusing working capital into the company." *Id.* at 10–11, PageID.79−80. As the Arbitrator aptly put it, "[t]he issue is not whether Hawaiian Host or Citadel complied with the Credit Agreement, but rather that Citadel had no right obtaining the benefit of the Credit Agreement in the first place." *Id.* at 11, PageID.80.

Similarly, the court rejects Citadel's challenge to the Arbitrator's "termination" of security interests imposed based on credit documents, and his order "to act in good faith and release the liens and any other interests associated with the LPAA." *Id.* at 12−13, PageID.81−82. The parties gave the Arbitrator broad authority to remedy a breach of the Confidentiality Agreement and to award appropriate declaratory and injunctive relief. *See* ECF No. 27-27 at 1, PageID.2214; ECF No. 16-9 at 6, PageID.438 (giving Arbitrator the power to

award "all other remedies available under contract, at law, or in equity"). The remedies he awarded were not based on a breach of credit documents, but on a breach of the Confidentiality Agreement—which was squarely before him in the arbitration. Termination or release of liens that resulted from a breach of the Confidentiality Agreement are logical remedies, well within the scope of the Arbitrator's powers. The awards were certainly not "completely irrational" or in "manifest disregard of the law." *Kyocera Corp.*, 341 F.3d at 997.

Ultimately, Citadel's arguments attempt to challenge the merits of the Arbitrator's decision, but—again—this court has no authority under the FAA to re-weigh the evidence. *See, e.g.*, *Asignacion*, 783 F.3d at 1015 (stating standard under the New York Convention); *Aspic Eng'g & Constr. Co.*, 913 F.3d at 1166 (reiterating standard under 9 U.S.C. § 10(a)(4)). In deciding "complete irrationality," the court is to decide only whether the decision "draws its essence from the contract, not the rightness or wrongness" of it. *Id.* The award easily passes this test.

**B.    Citadel Fails to Establish the FAA's Vacatur Standards**

**1.    *9 U.S.C. § 10(a)(1)***

Citadel attempts to vacate the Arbitration Award based upon the fact of (or timing of) Hawaiian Host, Inc.'s change in corporate status to Hawaiian

Host, LLC, as noted earlier.  First, some background details.  The arbitration was

instituted on October 31, 2020, by Hawaiian Host, Inc.  *See* ECF No. 12-1 at 6,

PageID.75.  Soon thereafter, around December 31, 2020, the stock of Hawaiian

Host, Inc. was acquired by HHML Acquisition, LLC.  *See* ECF No. 58-2 at 2,

PageID.3599.  The arbitration proceeded with discovery and motions into 2021.

The arbitration hearings then occurred in stages, beginning on October 25, 2021,

and ending on December 17, 2021.  After the close of evidence, but before closing

briefs were filed, Hawaiian Host, Inc. was converted to Hawaiian Host, LLC, on

December 31, 2021.  *See* ECF No. 52 at 2, PageID.3446.

      The President of the Hawaiian Host Group, Edward Schultz, explains:

"[b]ecause of the nature of its subsidiaries, Hawaiian Host[, Inc.] and its owner,

HHML Acquisition LLC, decided to accomplish that conversion via a merger of

the corporation into a newly formed LLC."  ECF No. 44-1 at 2, PageID.3011.

"The conversion was implemented so that Hawaiian Host would be the same type

of entity as its parent company, HHML Acquisition LLC," as well as for

"potential[] tax benefits for the overall company structure."  ECF No. 68-1 at 2,

PageID.3867.  HHML Acquisition LLC thus became the sole member of the new

entity, Hawaiian Host LLC, just as it was the sole shareholder of Hawaiian Host,

Inc.  *See* ECF No. 44-3 at 1, PageID.3019; ECF No. 68-2 at 1, PageID.3875.

After the merger, the parties submitted final briefing for the arbitration on January 18, 2022, and presented closing argument on January 21, 2022. *See* ECF No. 12-1 at 3, PageID.72. The Arbitrator issued his initial decision on February 10, 2022, followed by the amended award on March 29, 2022, all with Hawaiian Host, Inc. as the Petitioner. *See id.* at 16, PageID.85. And Hawaiian Host, Inc.—not Hawaiian Host, LLC—filed the Motion to Confirm Arbitration Award in State Court on February 14, 2022. *See* ECF No. 1-3.

Citadel claims it did not discover the existence of the merger and of the conversion of Hawaiian Host, Inc. into Hawaiian Host, LLC, until May 13, 2022—well after confirmation was sought in State Court and the case was removed to federal court. *See* ECF No. 32 at 2, PageID.2446. Given the merger, Citadel contends that Hawaiian Host, Inc. lacks standing to confirm the Arbitration Award, and that the circumstances "constitute[] fraudulent concealment" and fraud, requiring vacatur of the Arbitration Award under 9 U.S.C. § 10(a)(1). ECF No. 55 at 4, PageID.3468. The court disagrees.

a.    *Improper party (lack of standing)*

Hawaiian Host (whether Hawaiian Host, Inc. or Hawaiian Host, LLC) has established that the merger of Hawaiian Host, Inc. with Hawaiian Host, LLC was accomplished under Hawaii's Uniform Limited Liability Company Act, HRS

ch. 428 (the "LLC Act").  *See* ECF No. 44-2 at 1, PageID.3013.  Under the LLC

Act, HRS § 428-906(a), when a merger occurs:

> (3) All debts, liabilities, and other obligations of each
> entity that is a party to the merger become the obligations
> of the surviving entity;
>
> (4) An action or proceeding pending by or against an
> entity that is party to a merger *may be continued as if the*
> *merger had not occurred* or the surviving entity may be
> substituted as a party to the action or proceeding; and
>
> (5) Except as prohibited by other law, all rights,
> privileges, immunities, powers, and purposes of every
> entity that is a party to a merger become vested in the
> surviving entity.

(Emphasis added).  These provisions are consistent with dissolution provisions of

Hawaii's Business Corporations Act, which provide in pertinent part that:

> (b) Dissolution of a corporation does not:
>
>     . . . .
>
> (5) Prevent commencement of a proceeding by or against
> the corporation in its corporate name; [or]
>
> (6) Abate or suspend a proceeding pending by or against
> the corporation on the effective date of dissolution[.]

HRS § 414-385.  The provisions of the LLC Act are also consistent with the

merger agreement itself, which provides in pertinent part:

> [A]t the Effective Time[,] all the shareholdings, property,
> rights, privileges, powers, assets, and franchises of

> [Hawaiian Host, Inc.] shall transfer and vest in [Hawaiian Host, LLC] and all debts, liabilities, obligations, restrictions, and duties of [Hawaiian Host, Inc.] shall become the debts, liabilities, obligations, restrictions, and duties of [Hawaiian Host, LLC], and all and every other interest shall be thereafter as effectually the property of [Hawaiian Host, LLC] as they were of [Hawaiian Host, Inc.].

ECF No. 44-2 at 2 ¶ 3, PageID.3014.  Effectively, the merger simply converted Hawaiian Host, Inc. into Hawaiian Host, LLC, such that the LLC stepped entirely into the shoes of the corporation.

Given that "[a]n action or proceeding pending by . . . an entity that is party to a merger may be continued as if the merger had not occurred," HRS § 428-906(a)(4), the Arbitrator had the power as a matter of Hawaii law under the LLC Act to issue an award (in favor of, or against, Hawaiian Host, Inc.) without the formality of substituting Hawaiian Host, LLC.  For the same reason, confirmation (or vacatur) in the name of Hawaiian Host, Inc. is allowable here as a matter of law.  Even though a new "case" was opened in State Court for Hawaiian Host, Inc.'s Motion to Confirm Arbitration Award (which was then removed to federal court), the confirmation and vacatur motions are, in reality, considered under the FAA to be part of the same ongoing arbitration "proceedings."  *See, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 107–08 (2d Cir. 2006) (recognizing that a

57

motion to confirm and a motion to vacate "are motions in an ongoing proceeding rather than a complaint initiating a plenary action" (citing 9 U.S.C. § 6)).[16]

And even if this confirmation/vacatur action is considered to be a new proceeding, Hawaiian Host, Inc. still has the power as a dissolved corporation to institute new actions in winding up affairs under HRS § 414-385.  *Cf. Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 383 (2d Cir. 2021) (recognizing, in addressing standing of a dissolved corporation, that state laws often grant dissolved entities continued existence even after dissolution so that they can wind up their affairs); *Baskin-Robbins Franchising LLC v. Morris*, 2011 WL 3734234, at *3 (D. Haw. Aug. 23, 2011) (reasoning that HRS § 414-385 "establish[es] that Paradise's dissolution does not prohibit, prevent, suspend or abate Plaintiffs' ability to bring this lawsuit against Paradise").  In short, there is no requirement for Hawaiian Host, LLC to substitute itself in place of Hawaiian Host, Inc. in this confirmation/vacatur action.[17]

---

[16] 9 U.S.C. § 6 provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."  That statute applies here even if this is a proceeding under FAA chapter 2 (not chapter 1).  *See* 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.  This chapter applies to the extent that this chapter is not in conflict with chapter 4.").

[17] At most, the court could easily—but need not—substitute or join Hawaiian Host, LLC as a petitioner.  Federal Rule of Civil Procedure 17(a)(1) requires an action to "be prosecuted in

(continued . . .)

### b. Fraud

Citadel also argues that the merger constituted fraudulent concealment or fraud, such that the award must be vacated as having been "procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). Fraud under the FAA must "be proven by clear and convincing evidence, not be discoverable by due diligence before or during the proceeding, and be materially related to the submitted issue." *Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991). "[B]ecause of the strong federal policy favoring arbitration," fraud under the FAA requires "an extremely high degree of improper

---

(. . . continued)

the name of the real party in interest." But even if Hawaiian Host, LLC is considered to be the real party in interest, Rule 17 also provides:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed. R. Civ. P. 17(a)(3). After Hawaiian Host, Inc. explained that, as a result of the merger, the LLC fully steps into the shoes of the corporation, it represented to this court that it would agree (although not necessary) to joining Hawaiian Host, LLC as a party in light of Citadel's position. *See* ECF No. 44 at 5, PageID.3006. This statement would be a sufficient "ratification" for Rule 17's purposes here, where "Rule 17(a) is designed to prevent forfeitures, and as such must be given broad application." *Esposito v. United States*, 368 F.3d 1271, 1278 (10th Cir. 2004). The action would thus "proceed[] as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3).

conduct," which is a "greater level of improper conduct" than common law fraud. *Id.*

According to Citadel, Hawaiian Host hid the merger, which "secretly recapitalized [Hawaiian Host, Inc.]" ECF No. 62 at 6, PageID.3676. This activity, according to Citadel, was completely contrary to Hawaiian Host's position at the arbitration that it could not "raise new capital" because of Citadel's alleged wrongful breach of the Confidentiality Agreement (i.e., misuse of Hawaiian Host's confidential financial information to obtain the FHB loans without securing written approval). According to Citadel, the non-disclosed merger (or non-disclosed plans for a merger) was material because it proved that Hawaiian Host had the ability to obtain additional funds and "shows that it was unconstrained in its organizational choices and materially rebuts any argument that Citadel prevented [Hawaiian Host, Inc.] from restructuring, which was the basis for operational and other damages in the Award." ECF No. 55 at 6, PageID.3470. And, according to Citadel, the failure to disclose the merger, violated the Credit Agreement and the Arbitrator's disclosure orders associated with the injunction he had granted against Citadel.

The actual record, however, belies Citadel's claims. Citadel has failed to prove by clear and convincing proof that Hawaiian Host committed fraud. The court agrees with Hawaiian Host's explanation that the merger was a

straightforward change in corporate form—with the same ownership—that was not material to any issue in the arbitration.  It was done through public filings, not hidden from anyone.  There is no evidence of a fraudulent intent, and nothing on which to presume such an intent.

The "infusion" of capital from HHML Acquisition, LLC of a nominal amount of $1,000 proves nothing, where Hawaiian Host was facing a shortfall of millions of dollars, and was seeking millions in new equity.  The Arbitrator did not award damages against Citadel based on Hawaiian Host's inability (given the breach of the Confidential Agreement that he found) to obtain any working capital or a constraint to "make organizational choices."  Rather, Hawaiian Host's theory—accepted by the Arbitrator—was that it was prevented from fundamental recapitalization of the sort that led to the Citadel/First Hawaiian/Hawaiian Host negotiations in the first place (negotiations concerning restructuring or refinancing of multi-million-dollar loan agreements and related documents), given Hawaiian Host's major financial difficulties triggered by the pandemic and other events.  The Arbitrator's decision reflected that theory when he found that: (1) "Citadel prevented Hawaiian Host the opportunity to extinguish the loans at less than par value when it illegally purchased the loans," ECF No. 12-1 at 9, PageID.78; (2) "Citadel also prevented Hawaiian Host from extinguishing the loans through an

outside investor which would have stopped the accruing of interest," *id.* at 10, PageID.79; (3) "[b]ut for Citadel's illegal purchase of the FHB/CBP loans, Hawaiian Host would have been able to obtain an infusion of working capital to prevent losses in missed or short shipments," *id.*; and (4) "[a]s a result of the inability to recapitalize, Hawaiian Host was unable to maintain proper levels of finished goods, raw chocolate and packaging, and as a result lost out [on] profits of $2,033,667.00," *id.* The Arbitrator was discussing large scale recapitalization and infusions of working capital, not a name change with the same owner and a nominal $1,000 contribution.  The merger (or "undisclosed" plans for a merger) was not material.

The court allowed Citadel to explain its theory of fraud in extensive post-oral argument briefing, *see* ECF Nos. 62, 73, and, after reviewing Citadel's arguments, the court completely rejects Citadel's—serious, but ultimately baseless—accusations of lying and perjury by Hawaiian Host's witnesses. Moreover, as acknowledged by the Arbitrator, the Arbitrator (as does this court) lacks "jurisdiction over the [First Hawaiian] Credit Agreement terms and conditions and whether the parties (Hawaiian Host and Citadel) complied with those terms and conditions."  ECF No. 12-1 at 10, PageID.79.  Thus, the court need not definitively address Citadel's accusations that the non-disclosure of the merger

violated independent reporting obligations.[18]  It is enough that the merger, and the non-disclosure of it and the plans for it, were not fraudulent.  In short, after considering all the arguments regarding the merger, the court is easily satisfied that the Arbitration Award was not procured by "corruption, fraud, or undue means" under 9 U.S.C. § 10(a)(1).

### 2.      *9 U.S.C. § 10(a)(4) Irrationality or Manifest Disregard of Law*

Lastly, the court addresses Citadel's claim under § 10(a)(4) that the Arbitration Award is in "manifest disregard of law."  It contends under the "manifest disregard" test that the Arbitrator "recognized the applicable law and then ignored it."  *Collins*, 505 F.3d at 879.

The Confidentiality Agreement contains an "anti-waiver" clause reading in part that "[n]either this paragraph nor any other provision in this Confidentiality Agreement can be waived or amended except by written consent of [Hawaiian Host] . . . ."  ECF No. 16-9 at 5, PageID.437.  Hawaiian Host had apparently argued that this clause barred Citadel's estoppel/waiver defense—i.e., a defense along the lines that Hawaiian Host, by conduct or otherwise, had waived a requirement for written approval of Citadel's purchase of the loans from First

---

[18] Given the detailed and persuasive explanation by Hawaiian Host's counsel, *see* ECF No. 68-3, it appears that the non-disclosure did not violate any reporting requirement imposed by the Arbitrator's injunction orders concerning the Credit Agreement.  *See* ECF No. 12-1 at 9, PageID.3886.

Hawaiian.  The Arbitrator rejected Citadel's estoppel/waiver defense, and Citadel now claims to this court that the Arbitrator recognized but ignored the law that "principles of equitable estoppel allow waiver of an anti-waiver clause based on a party's conduct."  ECF No. 16-1 at 33, PageID.138.

Citadel points to this part of the Arbitration Award:  "Citadel has not met its burden of proof on its affirmative defenses.  The anti-waiver provision in paragraph 9 of the Confidentiality Agreement bars an estoppel defense as a matter of law . . . ."  ECF No. 12-1 at 8–9, PageID.77–78.  But this argument fails to recognize the full reasoning—the Arbitrator continued to explain:

> . . . and there is no evidence that the parties waived or amended any provision of the Confidentiality Agreement by written consent under paragraph 9.  Citadel has failed to meet its burden of demonstrating that Hawaiian Host is estopped from requiring written approval of the debt purchase by Hawaiian Host's course of conduct.

*Id.* at 9, PageID.78.  The reasoning does not demonstrate that the Arbitrator ignored equitable principles; it suggests he based his decision on the facts and evidence presented to him regarding Citadel's defense.  It is not "clear from the record that the arbitrator[] recognized the applicable law and then ignored it." *Collins*, 505 F.3d at 879.  At best, Citadel is arguing that the Arbitrator's conclusion was wrong.  But the court does not decide "the rightness or wrongness" of his contractual interpretation—it only decides whether his decision "draws its

64

essence from the contract." *Aspic Eng'g & Constr. Co.*, 913 F.3d at 1166. The
Arbitration Award certainly does just that.

Similarly, the court rejects Citadel's argument that the award of
certain damages was a "Manifest Disregard of Legally Dispositive Facts." ECF
No. 16-1 at 28, PageID.133 (title of argument). That argument is based on
Citadel's view of the evidence, but this court is not free to re-examine the evidence
for factual error. *See, e.g.*, *Misco*, 484 U.S. at 38.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court (1) GRANTS Hawaiian Host's
Petition to Confirm Arbitration Award, ECF No. 1-3, and (2) DENIES Citadel's
Counter-Motion to Vacate, ECF No. 16, Arbitration Award. The arbitration award
is CONFIRMED.

By November 8, 2022, Hawaiian Host shall prepare and file a
proposed form of judgment based on the terms as found by the Arbitrator. After
submission, the Court will approve or modify the language and provide it to the

///

///

///

Clerk of Court, who shall then enter Judgment in favor of Hawaiian Host, Inc., and

close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 31, 2022.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Hawaiian Host, Inc. v. Citadel Pacific Ltd., et al.*, Civ. No. 22-00077 JMS-RT, Order Granting Petitioner's Motion to Confirm, ECF No. 1-3; and Denying Respondents' Counter-Motion to Vacate, ECF No. 16, Arbitration Award